Good morning everyone and welcome. Judge Bauer and I are pleased to be joined on the bench this morning by Judge Michael Reagan, Chief Judge Michael Reagan of the Southern District of Illinois sitting with us today by designation. Welcome. Thank you. With that we'll call the first case this morning which is In Re Dairy May it please the court. Christopher Longo for the appellant plaintiff. Good morning your honors. I wonder if you pull that microphone up or raise it. There's a place to raise the platform. Underneath. There's a button on the right. You got to be a mechanical genius to practice law here. I'd move it closer to his mouth if I were you. That's the way. May it please the court. Christopher Lovell for the plaintiff appellant. I'll just call us plaintiffs appealed from summary judgment ruling and an antitrust and commodity case. Standard on summary judgment is that the plaintiffs have to point to evidence that's more consistent with agreement than independent action. Resolving the disputed issues in favor of plaintiffs and not weighing the evidence and not making credibility determinations and resolving all inferences in favor of plaintiff. What is your best evidence of concerted action? I say the best evidence of concerted action is that after meetings between the CEOs including a meeting on May 11th shortly promptly after that Schreiber radically changed its conduct so as to rescue DFA's holding up of prices in a way that neither one could have done individually. Well do we know anything about this meeting other than that it was had? Yes we do your honor. I wouldn't hang on to the microphone if I were you because it makes noises. Sorry judge, that's interfering. What we know about the May 11 meeting is that the CEOs discussed future CME prices and present CME prices. That's based on the and an agenda of the meeting that was there. Now the CEO of DFA could not remember the meeting but said that his practice was when meeting with the CEO of Schreiber to talk about whether current cheese price levels would hold. Talk about market conditions which means whether current cheese price levels will up CME cheese prices. Schreiber knew that DFA was holding up CME cheese prices and if they followed their normal practice they talked about whether current CME cheese prices would hold. So we know we know all that your honor and on the summary judgment standard this gives way more evidence than in the other cases this text messaging decision that just came down a couple weeks ago by Judge Posner Judge Woods on that panel. They said that had there been meetings of the executives specific meetings of the executives or specific price discussions that would have made things better and had there been they affirm summary judgment and also it was said that if there were prompt changes in conduct after the meetings that would have made things better. Well on May 13th in this start working with DFA at this Chicago Mercantile Exchange to make it more difficult for sellers to replace cheese. Well that begs the question actually it just you're suggesting that there's evidence that they started working toward that mutual and and I'm not sure that that's what the evidence suggests because these meetings as I understand the record occurred quarterly for a long time because DFA was a supplier as well as the two being competitors and and there is an independent justification for Shriver's activity in the market with respect to barrel cheese at this particular time. That explanation being to reduce the spread between block cheese prices and barrel cheese prices. Judge Sykes there's a lot of evidence on those points and you've covered a lot of ground just on the first point though that I was saying about the change in conduct. There's actual emails from between DFA and Shriver talking about this DFA asked for Shriver's floor broker name at the CME and confidential information. Shriver provides it they talk back and forth about doing this and making the and the rationale for making it more difficult to for sellers to replace the cheese in part is that the sales of cheese changed the price originally. Now when that doesn't hold the prices up on May 21st DFA's CFO CEO pardon me who just been in the meeting with Shriver's CEO sends out an email and says I can't hold up the prices anymore if this spread between the block and barrel cheese stays at 19 cents and that's quoted in the record on the very next moment May 24th which is Monday but that was on Friday Shriver steps in and does something that's never done totally uncharacteristically. It moves the price of the barrel cheese up 16 cents a pound second largest increase on record that our economist says the chances of that happening is like five one hundredths of the cheese to move up to rescue the price support. Why does Shriver do that? Because there's a copious evidence your honor from Professor Jesse and others that Shriver's interest is not in closing the spread although that would be nice their big interest is in higher prices and we have fact after fact or fact from our economists no rebuttal affidavit from their economists Professor Jesse showing that the interest is in higher prices so now they're doing something together for the next 28 calendar days and 20 days that neither one could do on their own. You never find these facts in other cases now what is it that they do? The conduct is totally unprecedented and we put in the statistics on this I'll just read this your honor because it's according to our economist, this is Professor Pierron, this conduct is more than any competition or separate conduct. One, Shriver fixes the barrel cheese price at a $1.77 every trading day the closing price for 20 straight days. DFA fixes the closing price for the block cheese every day 20 days at a $1.80 per pound. In order to do that Shriver had to buy 100% of the barrel cheese. There's a certain phrase that ends up ergo proctor hoc that this happened first and therefore it must have been responsible for what happened later and that's essentially it seems to be what you're doing that they met they talked they discussed things and then something else happened. Well your honor I think it's a little more than that Latin phrase if I understand the Latin phrase it means that you're sort of assuming that two things are related but maybe they're not yeah you know the definition of an economist is a guy who talks about things you don't know anything about makes it sound like it's all your fault well okay in this case you're not well anyway you're right here's it's in other words when one is holding up cheese prices unlawfully and the CFTC brought a case in its DFA and then they have a discussion the two CEOs about holding up prices and then the one who's holding it up can't hold it up anymore unless it gets rescued and Shriver radically changes its conduct to rescue them and the third shows that there's a plot that's sufficient out of the cases to give a reasonable inference of this is just what the text messaging case and all the cases we cited your honor and the third thing is your honor that there was an extraordinarily high volume of because they were pegging the price at a level all these sellers came in that's why DFA couldn't do it on its own because there's too much selling so only by working together could they absorb all the selling Schreiber bought 20 times as much as normally DFA bought 11 times as much as normally nobody else no other participant in the whole world bought any because they didn't want to pay the price it's not that we get summary judgment on it we don't have to get summary judgment it's that there's a professor peer on the economists showed that these statistics I know this isn't a piece of it anyway the statistics showed that there was a five one hundredth percent chance that the price would go up that much on May 24th now what is the chance if that's going to happen you know statistical significance is 5% 5 100 is like a thousandth of that or so what is the chance that that very very very rare event is just going to happen to happen just when DFA needs it to happen it's mind-bogglingly rare but what is the chance it will happen if there's an agreement when they had these discussions about whether cheese prices will hold then it's the expected outcome so so this sequence of facts and don't have one package up I know I've been talking for a while your honor to point to the evidence but this sequence of facts gives rise to a reasonable inference that an agreement was made and the agreement was to hold up cheese and they acted in highly unusual parallel fashion to do so now on the so so that is our best evidence to answer your honor's first question and then I mean you described this as highly unusual it was not unusual for Schreiber to monitor the spot cheese prices and to be concerned about the spread you're completely rational economically based on its business and also ordinary in the course of its business you're well actually no your honor our economists showed as follows between November 19 2003 and December 1 2003 the spread was from 17 cents to 21 cents Schreiber bought zero that happened at other times in fact all these times when the spread was high way higher than normal Schreiber bought zero this is in Professor Pierrong's affidavit paragraph 75 Jesse paragraph affidavit paragraph 50 Pierrong affidavit paragraph 74 and 20 between October 11 2000 and March 31 2004 our year Schreiber bought only 13 loads in total for three years now during our little 20-day period they bought 79 loads 100% of the market on October 1st 2004 a little bit after this the spread was 15 cents per pound and Schreiber's cheese buyer said we're not buying cheese today this is quoted in our reply brief we're not buying cheese today we already have too much barrel cheese what we're lacking is block cheese by having a wider spread people would be encouraged to make block cheese and that was the exact and Professor Jesse has shown those circumstances were the exact circumstances that existed during the conspiracy period so although Schreiber didn't have any policy to close the spread the president of Pozniak said there was no policy they only bought when there was a need for cheese and Judge Dow found is a disputed issue whether they had any need here's here's what Professor Jesse testified they had excess barrel cheese and they were lacking block cheese and they'd increase their barrel cheese inventory by five times the national average and he has other statistics and we cite to that in the reply brief so not only didn't they have any written policy they didn't have a general policy the conditions in which they had it match their statements that this isn't the time to close the spread moreover there's no emails during May 24 to June 22 saying that they're doing that to and years after the fact and after Pozniak testified I'm saying it phonetically his name's actually pronounced push not mr. push not the president but when you read it you wouldn't know that's who it is years after that happened now it's been emphasized that they're doing this to close the spread well we're not gonna we don't have to get summary judgment that that's a lie but the false statements what the judge Dow found that the the fact that we contested eight of the nine facts about closing the spread and put in all this evidence that there was no written policy no oral policy no conduct policy and the conditions that existed showed there was any policy they had didn't apply in those conditions and they just had didn't did not do it in those conditions in October judge Dow found that it was uncontested that they were acting to do it to close this to you know hold the prices up in this honor and you know we respectfully submit that's an error so so that's that's our best evidence on to show an agreement and it's our pretty much all of our best evidence evidence to show falsity but I test on one point that I didn't go into and that is Shriver's interest in higher cheese prices Shriver sent out a March 15 email which the government failed to question about I don't know if they saw it in which they said they wanted their conduct and they see me would be designed as a mr. Pazniak would be designed to force craft to raise its prices in the stores prices for cheese in the store excuse me and mr. Dunford who's the sales executive then the number two sales executive respond and said let's hope our customers don't find out let's hope the trading at the CME remains confidential there's other documents in addition to that quote that we cite including their profits and other documents professor Jesse opines that certain parts of their business mr. Dunford says they always make more money in the restaurant business when prices are higher professor Jesse opines that restaurants are highly priced in elastic so that if you have a little more cheese for your cheat pardon me you to pay a little bit more for your cheeseburger at the restaurant you know McDonald's is a customer and customers like that you're not going to stop buying cheese and with the restaurant business and other types of their business it's a pure gain to have prices higher with the other part of the business is a grocery store business with the grocery store business at least when prices got to their top there is a little loss of sales there's more elasticity because the customers just getting cheese at the store still in the 15 email Schreiber wanted to force craft to raise prices in the store and their conditions in which Schreiber wants to raise prices for that so that when we show their profits your honor the profits plummet after the prices plummet when the prices come down the profits come down from 28 million to 4 million this is one of the costs of a manipulation for you know jointly working together to do what they couldn't have done alone in an agreement they made more money for a while but then profits went way down because they couldn't hold the prices up anymore so in in some on these two points for the antitrust claim players respectfully submit as follows there was more than ample evidence that's just not present in other cases of CEO meetings radical changes in conduct right afterwards and I competitive conduct meaning artificially high prices and rescue in an improbable time that makes no sense statistically by chance but it's very well explained by agreement as to the supposed legitimate conduct explanation that Schreiber has the burden to make out under sell attacks and under the JFC case if it's their their con their supposed legitimate independent conduct is a pretext that can count towards the agreement that can tend to show agreement not by itself that's this court's opinion the Seventh Circuit opinion not by itself but with other evidence and under US versus Edwards in other cases by this court Edwards versus J.D. Edwards versus Kidani if someone puts in a false affidavit that can be used to show proof positive of what's being denied not by itself it can't show liability by itself but it can show that so we've put in evidence that there was omitted to say the real interest is in higher prices and that there was offered the need for the and the close the spread which can be found to be false based on all this evidence and the expert affidavits that were not rebutted by an expert so there's no economist saying the other thing on the other way that that's the case as to the antitrust that that's the top line of the case to the antitrust claim I would move on to the commodity Exchange Act claim your honor unless you had more questions or I'm not clear on something I'm saying no go ahead okay okay thank you yeah I do I can I just see how many minutes I have left I've got 18 before rebuttal thank you very much all right so on the commodity Exchange Act claim section 13 of the 7 USC section 13 prohibits manipulation of the price of a commodity judge Dow found that the evidence was sufficient to show that Schreiber overrode the forces of supply and demand and inflated CME barrel cheese prices and CME prices for its own benefit that and and basically said that the the claim that would lie here would be a claim for violet because judge Dow found we say erroneously that that you couldn't have an agreement under the antitrust laws that a claim would lie for manipulation you're now earning a rebuttal you know I mean I'm into my rebuttal time no you're you're into your rebuttal now white light is on oh okay well I better stop then you're right I'll just I just one question before you sit down on your Commodities Act claim that that act pertains to or at least the provision that's in play here pertains to manipulation of the market for futures contracts and this is spot sales so we're not in that market no no it's more it's more broad your honor actually it's it called the Commodity Exchange Act is thought to be futures but what this what it makes a felony actually is to manipulate the price of a commodity now when you get to section underlying the futures contract yes that's already underlying the futures contract here is milk that's exactly right so your honor when you get to 22a there's a private right of action 22a is the private right of action to sue for manipulation you can sue for manipulating the futures contract price or manipulating the price of the commodity underlying the contract now professor Jesse showed that the correlate that the people who are in cheese use the milk futures to hedge including Schreiber we proposed facts on this and professor Jesse showed that the correlation between CME block and barrel cheese and the milk futures is 0.99 and moreover that the cheese price determines 75 to 85 percent of the milk price because the milk price is a formula it's not an independent price it just it gets its it gets its life from right but just because the USDA uses cheese prices as part of the inputs for the milk price doesn't make cheese the commodity underlying the milk future I I think the indicia well I'm not seeing the connection there well the indicia I would respectfully submit on the cases and the purpose of the statute CEA is to be its main thing is to prevent manipulation and in the cans versus Stotler by this court says that the private right of action is critical to the integrity of the act and protecting the marketplace I'd say the purposes of the language commodity underlying the futures contract should be what's the contract call for for settlement you know which is a case from the Fifth Circuit and what is it that could manipulate the market and what is used to hedge well cheese is used to hedge cheese is the best or only way to manipulate because 75 to 85 percent of the price is determined by cheese in the formula and what is the contract call for it says that this shall settle to the class 3 milk price which is a formula it's not an independent price it's a formally determined by cheese whey and butter and cheese is the by bit by far the biggest factor so that doesn't that argument under the Commodities Act undercut your your argument on the no not it doesn't relate to it at all at all your it's not that the spreads not important it's that the the most important thing is to make the prices higher the thing about the spread is that with supply and demand the spread has gone from negative 15 cents to 32 cents and it's a euphemism to say I'm correcting the spread to three cents because that's actually depriving the market of information about what's the relative supply and demand for block and cheese which Schreiber's witnesses admitted and Professor Jesse stated and explained with the history of the spread trading so it's the the there is no policy to close the spread and the relevance of the spread to Schreiber is maybe the maybe if Schreiber got the prices high and could keep the prices high then also the spread should be in line but the dominant interest is to directed Mr. Erlash the trader to send a broadcast email to everybody in the company this is contemporaneous in 2004 this isn't something made up nine or four years later that those emails didn't say the spread change we're okay this might help the spread they said DFA let prices fall today we don't know why we'll let you know as soon as possible goes along with the profits and all this other evidence that shows that Schreiber's big interest was to move just like under the antitrust claim we're showing that Schreiber acted as judge Dow found to move the prices up if that satisfies your honor I'd like to quit this a little rebuttal thanks judge good morning your honors may it please the court my name is Nate Eimer on behalf of defendant Schreiber and I thought I would address the antitrust claim first if that pleases the court if I may Mr. Lovell's right they the plaintiffs here needed to come forward with evidence that tended to exclude the rationale that Schreiber's behavior was governed by his independent conduct and we put in a substantial record and I think judge Dow did an excellent job of summarizing that record of our continuing interest in maintaining the spread at about three cents that record goes back at least as far as 2000 the evidentiary record here and Schreiber had a history going back at least until 2000 of acting to maintain the shred of the spread between block cheese and barrel cheese the evidence is undisputed in fact the plaintiffs economists put in evidence that the average spread in fact was slightly over three cents during a 14 year period from 2000 to 2014 the USDA assumes that the spread will be three cents and figuring out this price of class 3 milk and so when the spread deviates from that Schreiber winds up paying more for milk than it gets for cheese or the other way around it loses more for cheese than it saves on milk depending on which way it spreads we had a substantial interest in it undisputed fact was that we bought 1.2 billion pounds of milk in 2004 and a differential such as the spread opened up in in May and 2004 cost Schreiber tens of millions of dollars during that period and that was unrefuted in the record it was also undisputed that Schreiber beginning in early 2004 long before this conspiracy supposedly was hatched a Schreiber tried to eliminate and or and tried to organize to eliminate the dual trading of barrels and blocks so that we could get rid of this concept of a spread and the CME because the spread was at times varying and it was very unfavorable to the barrel purchasers Schreiber also submitted evidence that on June 1 supposedly in the midst of this conspiracy Schreiber's president Mr. Ferguson wrote a letter to the CME brought a letter to the CME complaining about what he believed was manipulation on the CME because the spread had opened up to 19 cents and he said very clearly in that letter on June 1 and he said he was outraged he said I'm writing in reference to the trades made on the exchange on May 21st and May 24th the very days the plaintiffs are saying that we supposedly acted unconsciously and somehow joined a conspiracy our president is writing to the Chicago Mercantile Exchange complaining about what happened those very days not complaining about our conduct but complaining about conduct of other traders who've opened up this big 19 cent spread when it should be three based on the cost of the materials and he said that that 19 cent spread doesn't reflect the cost of raw materials for these two products and I think this is a clear indication that everyone in the dairy industry that CME is not acting as a decisive price discovery mechanism and it would be awfully strange for our CEO who supposedly is our lead conspirator to be writing to the board of the Mercantile Exchange and complaining about the conspiracy that he's supposedly engaging in but not only does that indicate our interest in the spread and maintaining the spread at three cents but our conduct does and our conduct is quite decisive if one wanted to look only at 2004 beginning in February of 2004 we produced emails to the court and in the record showing that we were trying to close the spread in February of 2004 and that we bid and bought on the exchange in February of 2004 to close the spread we did it in March of 2004 their emails from March of 2004 and your opponent contends that during the conspiracy period in May the activity was unusually high it was not your honor if one goes back to 2000 the year 2000 we did exactly the same thing in fact we bought 138 barrels in a 20 day period to close the spread in May in between I think what percentage of the market did that constitute it was the vast percentage of the market and I don't have the exact numbers but I don't know there was anybody even close to Shriver at that point I remember this is an open market that's the other thing the plaintiffs overlook here there's nothing that keeps there's hundreds of millions of pounds of cheese straight sold every year in the open market and if the price on the CME doesn't reflect what people think it should reflect there's nothing that keeps them from coming to the CME to reflect that so during this period where we supposedly manipulated the market by buying I think it was 3 million pounds 3.2 million pounds of cheese Shriver off the CME bought a hundred million pounds of cheese so our trading on the CME was negligible compared to the actual amount of cheese we bought it was a trivial amount of cheese and not only that because we needed the cheese we imported 17 million pounds of cheese from Europe because we were worried about shortages of cheese in the fall of that year and so it's far from being an anomaly it wasn't anomaly at all it had happened exactly this way in 2000 when there was pressure on the market to expand the spread we did it twice that year. In 2000 we bought 138 loads of cheese in August and then again in September we bought 49 loads of cheese on the CME to correct the spread and Shriver continued to defend itself it really is defending itself against other forces that are pushing the spread apart or pushing it together depending on the interests of the various parties. DFA was charged by the CFTC in this very period with manipulating the class 3 futures market by buying on the CME. It was that that caused the price apparently to be where it was at least according to the CFTC and the plaintiffs and what one sees is Shriver trying to defend itself against the spread that was being opened up by the purchases that were being made by DFA. That was perfectly lawful for us to do that there was nothing unlawful about it and there was nothing that was against our business interest. The plaintiffs have consistently in this case tried to find some way that this our conduct was against our business interest and if one goes back and looks at the complaint at that point they were alleging that we had a payoff from DFA. That DFA promised to sell us five million pounds of cheese to pay us off with entering into some conspiracy because it was against our business interest. Well that didn't survive long because when discovery opened up it was clear that we bought the five million pounds of cheese at the market price. So then when we were in the summary judgment motion Mr. Lovell changed the theory to well it wasn't five million pounds that was the issue and it wasn't a payoff based on that price but we didn't take delivery until August and by August the price had gone up and the difference somehow compensated us for the losses that he says we took. Well they also say we made money on it we wanted to raise the price and we took losses they have like all sorts of shifting theories as to why this was in our business against our business interest and we had to be paid off by the DFA. But in fact what Judge Dow correctly found was how in the world when we bought this cheese in July would we know the price would go up by August and we asked for delivery in July and so the supposed payoff theory has been dropped in this court altogether. They haven't argued that at all now. Now they have a whole series of theories that I think are also, first of all they don't even they don't even dispute the narrowing the spread was in our interest. Professor Jesse says it was he just says it wasn't proportionate whatever that means. Well I don't know what the court thinks but to me 1.2 billion pounds of milk sold at a disadvantaged price sounds pretty substantial to me. So their new theories are one is that the trading activity was unusual as your Honor mentioned and Judge Dow found that it wasn't unusual because the undisputed record is that the price has stagnated for long periods of time both on the barrel market and on the block market and he gives a pretty good summary of that on pages 31 through 33 of his opinion. That the price swings have been substantial over times that they're big big swings in the spread and Mr. Lovell points to the swing on May 24th when we supposedly changed our conduct which we didn't change but we bid up the price from $1.61 I think it was to $1.77 that day for the barrel price. Well the thing that he didn't tell the court was under the CME rules and I think it's exhibit 41 to their brief under the CME rules we can't just jump the price up. So it started at a $1.61 and then we bid a $1.62 and nobody sold to us. We bid a $1.63 and nobody sold to us. We bid a $1.64 and nobody sold to us. Nobody sold until we got to a $1.77. So how is that an artificial price? We actually did exactly what the CME is supposed to be. We discovered the price. The real price that day was a $1.77 because no one would sell till a $1.77. And then until June 22nd we bought cheese and so long as the price was at a $1.80 we bought cheese at a $1.77 and relative to the market we bought a very little amount of cheese. The three million pounds we bought was nothing compared to the hundred million we bought off the exchange or that was being sold by traders and buyers off the exchange as well. And on June 23rd they point to some unusual drop in the price. But what happened on June 23rd was the new market report came out on June 21st. It showed inventories up six or seven percent. Prices were starting to be bid down. DFA apparently tried to maintain the price but we did nothing. We didn't try to maintain the spread, the the price level of $1.77. As the price fell we were happy to let the price go down. And the price went down in conjunction of both together. So the spread maintained if the court looks after June 22nd the spread stayed at three cents a pound just as we wanted it to. Then it stayed at three cents a pound all the way down. And it stayed at three cents a pound until July when it opened up again and we began to buy again to narrow the spread. So the trading throughout this period is consistent with our interest in maintaining the spread and there's nothing to rebut it. What about the meetings during the That evidence may suffer from the propter hock fallacy that Judge Bauer was referring to. But it is there. There's no doubt. There's four meetings they point to actually. I can focus only on the May 11th meeting if the court wishes. The May 1st one was a Kentucky Derby party? The first one was a Kentucky Derby party. Mr. Ferguson said that he and his wife were invited to the Kentucky Derby. He didn't go to the first day's parties. He had an emergency at one of our plants and he went to the Derby with his wife and he said no one talked about business that day. So I don't know. You can skip to May 11th. Yeah so I thought I'd skip to May 11th. So May 11th is really distorted. So at first as your Honor noted, the May 11th meeting was one of our quarterly meetings. There's evidence that we have a quarterly meeting every quarter. We buy a hundred million pounds on average a year from DFA and cheese. They're a huge supplier. We're one of their largest customers. They met with us just as they met with all of their customers. There was nothing unusual about meeting with us. There is an agenda for every meeting just as we as lawyers would advise our clients to have in a meeting. The agenda was unchanged. We produced all of the agendas. They're the same. The first item on the agenda for every one of the meetings year after year is market conditions and forecast. The testimony was they discussed market conditions and forecast generally. And now I want to talk to the parts that Mr. Lovell emphasizes in the brief and in court today which are both inaccurate and wrong. First they said the meeting was hastily scheduled. So it was just some usual thing then trying to create the impression that we had to come to the rescue of DFA and they needed help and so they called us. There's no evidence the meeting was hastily scheduled. What they point to is a change in the itinerary because the Kansas City to Green Bay for the meeting and the testimony was that normally they use their own plane to fly up to Green Bay but for some reason their plane was occupied and they had to get a chartered plane to fly up to Green Bay. But there was no evidence that the date was arranged then. All that happened was and the only evidence is a change in the itinerary which made the itinerary the chartered plane. The other piece they point to is to show that it was sudden and somehow they needed to meet to get this conspiracy going was the chartering of the plane. That testimony was totally distorted. Yes they chartered a plane. It was what was missing in their brief was they chartered the plane because the company plane was tied up somewhere else. Then they said well they almost never meet at company headquarters. This meeting was at Green Bay or Shriver is. They always meet at trade association meetings according to their brief. That's a complete distortion of Mr. Korsmeier's testimony. Mr. Korsmeier testified to the opposite. That usually they met at headquarters of each other. They'd alternate between Green Bay and Kansas City and once in a while they would meet at a trade association meeting for the quarterly meetings. But that was not the regular practice. And now let me get to the conversations which I think is what your honor is focused on both. No one testified that there was discussion at that meeting about holding prices at the CME. That wasn't testified to at all by anybody. Mr. Hanman who testified earlier that he had had a stroke recently and was having trouble remembering details, particularly details from ten years previously, couldn't even remember going to the meeting. And the word hold actually is used in Mr. Hanman's testimony where he says that he would talk to Mr. Ferguson and his other customers about you know what the market was and what was going on and whether prices would hold. That's what he said. He wasn't referring to that meeting. He was referring generally to the conversations he would have with Mr. Ferguson when he would meet and talk about what they expect the market to do. They asked Mr. Ferguson, who did remember the meeting, what he remembered about it. And they tried several times to get him to talk about CME prices. So they asked him, do you remember any discussion about the CME cheese prices or unusual aspects of the market? He said, I don't recall anything specifically other than the forecast that we talked about. This is forecast for supply of cheese and so forth. This is in Mr. Ferguson's testimony in 2014. And then a little later in the transcript they tried to plant with him an improper question and assumed that he had talked about CME. So he was asked, when you talked about CME prices at the May 11, 2014 meeting, do you remember any discussion about who was and Mr. Ferguson, who listened very carefully, said, one is, I don't think I ever said we talked about CME prices. We talked about forecasts. So there was no discussion about holding price levels on the CME at that meeting. No one testified to that. There's no evidence that suggests that DFA and Schreiber discussed their own trading activities or intentions. In fact, everyone involved testified they didn't discuss those. So I think the May 11th meeting is nothing more than a meeting between a supplier and a customer discussing what the supplier, and this is only a one-way discussion, Mr. Ferguson testified that we never told DFA anything about what we thought the market was like. This is a supplier and a customer with the supplier telling the customer what they think the market's going to look like, what they expect in forecast, whether they think prices in general are going to be where they are. There was no discussion, no evidence of anyone discussing prices on the CME. If I may for a moment, I'd like to talk a little bit about our supposed lack of need for cheese. This is all great with hindsight. Dr. Jesse is talking about what he's looking at today, and he's looking at whether or not our inventories in May and June of 2004 were higher or lower than they had been in other years. But what's important to me is what was actually going on in 2004 and what people thought in 2004, and we have a very good record of what people thought in 2004. So first, in addition to the three million pounds that we bought on the CME, as I mentioned we bought a hundred and ten million pounds during that very period of cheese off the CME because we needed the cheese. We bought seventeen million pounds in Europe because we needed the cheese. There had been shortages all through 2004 up to that point, and prices had skyrocketed to the highest price ever for cheese. We had bid in March on the CME to try and buy cheese because we couldn't get cheese, and we were able to buy nothing. There was no cheese available in March. Why not? What was the explanation for the shortage? There were two explanations, Your Honor. One, mad cow disease was detected in Canada, and we closed the borders to the Canadian replacement heifers, so there was a shortage of heifers coming into the United States. And Monsanto makes a chemical or an additive, they would hate if I called it a chemical, but sorry about that Monsanto. Monsanto makes an additive to feed that enhances milk production, and their plant in Austria was closed by the Austrian government, and so milk production plunged, and there was a weather problem as well. So milk production plunged in 2004 in the early parts of the year, and there was nothing that showed that it was going to recover. And so our inventories hit an all-time low. We were down ten million pounds of inventory in April. In May we were still down five million pounds of inventory in May, and the unroboted testimony was that the industry, and the industry including Schreiber, expected shortages again in October and in the fall, because milk production peaks during the summer and then tapers off in the fall. And so Mr. Ferguson testified that he wanted to build inventory because he was a fear, he was afraid it was going to be short. Mr. Herlatch testified to exactly the same thing. He was our trader on the CME. Producers were buying and storing cheese, anticipating a shortage in October, is what he said, and that was exactly what we did. We bought cheese in those months throughout the summer, anticipating a shortage in October. In fact, the shortage didn't appear. Our documents indicate they would appear. Analysts, there's a whole series of analysts reports, I think we cited exhibits 23 and 25 to our brief, where analysts were saying that the dollar 80 price that DFA was supporting was probably the bottom of the market and prices were going to go up, which gets me to my next topic, which is they argue that the prices we paid were too high. Well, that's interesting because $1.77 actually was the lowest price that had prevailed since March 10th of 2004. It's true that later prices drop, but that's great if you're a Monday morning quarterback. It's not so great if you're sitting there on Sunday morning playing football. At the time, our contemporaneous documents show that the price was considered to be a very good price, not a bad price. Mr. Herlatch testified, it was correctly and without dispute, that $1.77 was 40 to 50 cents a pound lower than the price of cheese had been just a month or two before, and when he was buying cheese at $1.77 on the price. But there's no question there was a spike during the conspiracy period. No, it didn't spike actually. So the price came down to a low for one day on May 21st. That was $1.61, but it had been $1.83 or so just a few days before. Then we bidded up to $1.77 with unfilled offers, or bids, on May 24th as we bid $1.61, $1.62. Then it stayed at $1.77 until it began to drop after the June inventory report came out from the USDA. The spread spiked? The spread spiked before that, yes. So the spread spiked at around 19 cents or so on May 21st when it hit the big drop, and that's when Mr. Ferguson wrote his letter to the CME saying this is wrong, there can't be this kind of spike, and so we bid at three cents. So during the so-called conspiracy period, the spread is flat at three cents, and we maintained it at three cents. I mean we've never shied away from that, we've consistently said that's what we did. Maybe I should turn to the CEA if I may. Sure. So I think your Honor hit on the key point on the CEA. The cause of action that's at play here is one for manipulating the market for clear that the underlying commodity is, manipulation of the underlying commodity is what the issue is. The underlying commodity, courts have all said, is what's specified in the contract. The commodity specified in the contract is Class III milk futures. There have been a couple of other cases where people have tried to use some other reference point and say that well the price of the underlying commodity is somehow determined or affected by something else. This was what happened in the Hershey case, and the Court of Appeals there said no. The Hershey case was for gas futures delivered at Henry Hub rather than gas prices generally, your Honor. The plaintiff alleged that the defendant tried to manipulate gas prices generally, and the court held no. That's not what the contract specifies, you have to manipulate Henry Hub prices and you're not charged with doing that, and you didn't do that. And so the same thing happens here. The LIBOR case is the same. It's even more extreme. In the LIBOR case it's a manipulation of euro dollar, futures for euro dollars. Euro dollars are priced exclusively in relation to LIBOR. The defendants there, as a lot of cases are going on, were charged with manipulating LIBOR, and the court said no. LIBOR is not the underlying commodity. The underlying commodity is what it says in the contract. This interpretation would actually be a major expansion of the Act, the private right of action under the Act, as I understand it, to make actionable claims having to do with remote inputs into the price of the commodity that underlies the contract. Exactly, and no court has ever done that. And not only would it extend to cheese, there are actually three inputs into the formula price of milk. Cheese being one, butter another, and whey powder another. So if your Honor were to do what Mr. Lovell asked you to do, you'd be actually now expanding it to three commodities being the underlying commodity, because all three factor into the formula, and all three would, in his view, affect the price. So I don't know of any court that has been willing to take that sort of a leap, and I have a little bit of time left, but I think I'll close off unless your Honor has any further questions. All right, thank you very much. Mr. Lovell, you've got two minutes left. On the meeting, your Honor, the first meeting was on April 28th. It was a private meeting where Mr. Hanman picked up Mr. Ferguson at the hotel, and on April 29th... On the way to the Kentucky Derby. No, no, it had nothing to do with the Kentucky Derby. It was in Kansas City where Mr. Ferguson took a plane, was picked up by Mr. Hanman, they met privately at DFA's offices, and then took them back. On April 29th, the May 11th meeting was arranged. Now, as to the... Sorry, Judge. Go ahead. Yeah, so, and then the Kentucky Derby meetings come next. There's four meetings in total that have been testified to. On the May 11th meeting, this court said in Omnicare that where, not the CEOs were meeting, but where there were exchanges through the general counsels of price information, when they're both a horizontal competitor, as here, large horizontal competitors... But also supplier... And another relationship going on that the court has to walk a fine line. You just don't say, oh, it's okay to exchange price information. Judge Posner said in his book, and the cases say, and there's a Todd versus Exxon case in New York that says, just a dry exchange of prices when there's a customer-supplier relationship is okay. We cited below to company compliance manuals in our fee brief that came later, where if there's a horizontal competitor relationship and a customer-supplier relationship, they said, be very careful. You can't just talk about prices. Here, it's not an exchange. It's the CEOs of the companies. So, the fine line that was talked about in Omnicare is much more sensitive, because there's no general counsel present. There's no one present, and they're talking about prices, and Mr. Hammond says whether prices will hold. This type of communications have been enjoined and found to be violations themselves, when it's not the CEOs doing it. So, on the other hand, we want to be able to promote, if there's a legitimate negotiation of a contract, which hasn't been pointed to here, if there's something going on and they need to discuss prices in order to negotiate, which wasn't pointed to, nothing specific, we But to let horizontal competitors, large horizontal competitors, habitually begin their meeting talking about whether cheese prices will hold is way over the line. It's way over the line in the cases. And Judge Dow, with great respect, he's a great gentleman. He was always nice to us, and he did so much work on his opinion. Plaintiffs respectfully submit. He got this totally wrong by saying, once it's a customer-supplier, it ends the inquiry. No, under the law, it begins the inquiry, Your Honor, and when it's a delusion-facilitating device, one's unlawfully holding up prices. Will cheese prices hold? By horizontal competitors, Mr. Scholler said, the head of Schreiber Sales said, DFA is a very vigorous competitor when it gives good, low prices to our customers. They are very tough. And he said, DFA always manipulates. As the sun comes up in the East, they used to manipulate the Wisconsin Exchange, which closed in Milwaukee, Your Honor, during the 1990s. No playing to my status as a lawyer. Okay, all right. Your time has expired, Counselor, if you'd wrap up. And the last sentence is, Mr. Scholler said that anyone, told people, anyone who sells cheese, anyone who buys cheese from DFA is giving them an excuse to manipulate. Schreiber then entered a contract to buy the most cheese from DFA of anybody. Still, the horizontal competitor relationship was much larger, but both these companies empowered one another to do this manipulation structurally and through these conversations. Thank you, Your Honor. All right. Our thanks to both counsel. The case is taken under advisement.